DAVID L. ANDERSON (CABN 149604)
United States Attorney

HALLIE HOFFMAN (CABN 210020)
Chief, Criminal Division

ASEEM PADUKONE (CABN 298812)
ANDREW SCOBLE (CABN 124940)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6401
    FAX: (415) 436-7027
    Aseem.Padukone@usdoj.gov
    Andrew.Scoble@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 19-00280 RS |
| Plaintiff, | GOVERNMENT'S MOTION TO REVOKE RELEASE ORDER |
| v. | |
| FERNANDO ROMERO BONILLA, | |
| Defendant. | |

    PLEASE TAKE NOTICE that on December 28, 2019, at 1:00 p.m., or as soon thereafter as the matter may be heard, before the Honorable Richard Seeborg, the United States will move the Court for an order pursuant to 18 U.S.C. § 3145(a)(1) to revoke the Honorable Magistrate Judge Laurel Beeler's release order, and order defendant Fernando Romero-Bonilla a/k/a "Black" ("Defendant") detained pending resolution of his case.

Defendant Fernando Romero Bonilla, a/k/a "Black" ("Defendant") has been a long-standing member of *La Mara Salvatrucha* (also known as MS-13) since at least 2017, particularly in the 20th Street clique. The 20th Street clique has committed several violent acts over the past half-decade, including assault, attempted murder, and murder. Defendant himself has engaged in violent acts, including the assault of a family that included a 15-year-old boy in the Mission District, for which he has been charged with VICAR assault. Sixteen other members of the clique have been charged in this case, and fifteen of them remain in custody.[1]

In addition to engaging in violent conduct as a member of a street gang, Defendant (who lacks legal status in the United States) has a lengthy history of violating bond terms, fleeing law enforcement, and resisting arrest in the United States. Interpol has issued a Red Notice because he is also a fugitive in El Salvador. Even his siblings in Northern California who ultimately agreed to serve as surety and custodian expressed serious reservations about doing so.

At the detention hearing, the Honorable Magistrate Judge Beeler agreed with the government that Defendant posed a risk of flight and danger to the community, but found that certain conditions would mitigate those risks. The government respectfully disagrees. Given Defendant's track record, the Court cannot take Defendant at his word that he will comply with his bond conditions. The government respectfully asks this Court to revoke the magistrate court's release order and order Defendant detained pending trial.

## I.    PROCEDURAL BACKGROUND

On February 18, 2020, a federal grand jury returned a fourteen-count Superseding Indictment charging seventeen defendants with crimes related to their involvement in a racketeering enterprise. Defendant was charged in two counts: Racketeering Conspiracy (Count 1) and Assault with a Dangerous Weapon in Aid of Racketeering (Count 10). Count 10 stems from Defendant's January 24, 2019 assault on a family on 19th Street and Valencia. Defendant made his initial appearance on March 13, 2020, and was arraigned on March 16, 2020. The Court remanded Defendant to custody after Defendant waived a detention hearing and formal findings.

---

[1] One defendant has been granted temporary release due to a health condition.

1    Defendant moved to reopen his detention hearing on December 14, 2020.  In his bail proposal,

2    Defendant proposed a $100,000 unsecured bond, with his brother serving as a custodian and surety and

3    his sister serving as a surety.  Pretrial Services conducted a full bail study, and concluded that while

4    danger could be mitigated, Defendant posed a flight risk that could not be mitigated by any conditions.

5    As part of the process, Pretrial Services spoke to both siblings.  On December 21, 2020 both

6    siblings told Pretrial Services that they were unwilling to sign onto the unsecured bond.  The court held

7    a detention hearing on December 22, 2020.  Magistrate Judge Beeler indicated that she was inclined to

8    release Defendant if his siblings were willing to sign on as sureties.  She provided the bond admonition

9    to the proposed sureties and asked them about their desire to serve in that role.  The sureties again

10   reiterated that they did not feel comfortable signing onto an unsecured bond.  Magistrate Judge Beeler

11   then asked the sureties, multiple times, whether they would be willing to sign the bond, and even

12   lowered the bond amount to $50,000 at defense counsel's suggestion.  The siblings still stated that they

13   were not comfortable signing onto the unsecured bond.  As a result, the court detained Defendant.

14   A day later, on December 23, 2020, defense counsel indicated that Defendant's brother was now

15   willing to serve as a surety, and his sister who lives in Stockton was willing to serve as a custodian.

16   Defense counsel asked to reopen the detention hearing on December 24, 2020.  The government

17   requested that the court provide Pretrial Services and the government additional time to investigate the

18   plan since the proposed release plan was new and involved release to a different district.  The court

19   denied this request and set the hearing for December 24.  Pretrial Services again spoke to the siblings on

20   December 23, 2020.  The Pretrial Services Officer reported that both siblings *again* stated that they were

21   not willing to serve as sureties for an unsecured bond.

22   At the detention hearing the following day, Defendant's brother finally stated that he would be

23   willing to serve as a surety on a $50,000 unsecured bond, but only if he could get an assurance from the

24   court that he could back out of being a surety if he becomes concerned about Defendant's behavior.

25   After getting the assurance that he could call Pretrial Services and set the matter on calendar if he

26   became concerned, the brother agreed to serve as a surety and the sister as a custodian (but not a surety).

27   At the renewed bail hearing, the government proffered that Defendant posed a risk of flight and

28   danger that could not be reasonably mitigated.  The reasons included Defendant's violent history, his

GOVT'S MOT. TO REVOKE RELEASE ORDER

2

1  record of violating bond conditions, and his lack of truthfulness.  This conduct all occurred while

2  Defendant was living with his brother – the proposed surety – on bond from Immigration Court.

3       The magistrate court ultimately ordered Defendant's release on a $50,000 bond with home

4  confinement and electronic monitoring.  Defendant's brother is a surety and his sister, who lives in

5  Stockton, California is a custodian (but refused to be a surety).  The court found that because Defendant

6  is young, family support would help mitigate the risks of danger and flight.  The court acknowledged

7  that many of the points raised by the government were correct, but said that Defendant's under seal

8  filing (essentially, ███████████████████████████████████ painted a more

9  complex picture which supported her conclusion that Defendant's family involvement would mitigate

10  the risks.  The court also stated that it was unlikely that Defendant would flee to El Salvador in part

11  because he is contesting his immigration case in the United States.

12  **II.     FACTUAL BACKGROUND**

13       **A.     MS-13 Background**

14       *La Mara Salvatrucha*, also known as MS-13, is a Transnational Criminal Organization formed in

15  Los Angeles during the 1980s.  MS-13 has local "cliques" located throughout the world.  The

16  racketeering enterprise targeted in this indictment is the 20th Street clique, a collection of MS-13

17  members in the Bay Area who have perpetrated a series of murders, attempted murders, and violent

18  assaults over the last several years.  The defendants in this case are members of MS-13 20th Street.

19       Previous federal and local investigations have revealed that MS-13 members sometimes travel to

20  and from El Salvador, among other Central American countries.  MS-13 constitutes an ongoing

21  organization whose members function as a continuing unit for a common purpose of achieving the

22  objectives of the enterprise, including enriching the members of MS-13 and preserving the power of the

23  gang through fear, violence, and intimidation.  Members and associates of MS-13 violently clash with

24  members of rival gangs over control of drug territory and extortion victims, as well as over gang pride.

25  Indeed, members of MS-13 are expected to attack, or aid in the attack, on members or suspected

26  members of rival gangs if the opportunity arises.

27  //

28  //

**B.      Defendant's History of Bond Violations and Flight from Law Enforcement**

Defendant is a citizen of El Salvador who lacks legal status in the United States.  He is a fugitive in El Salvador, and the subject of an Interpol Red Notice.  Defendant has been involved in an immigration case for several years, during the course of which he was released on bond.  In May 2018, Defendant violated the terms his $12,000 bond by failing to appear for his I-340 interview.  Defendant also failed to appear for court that month, which resulted in him being removed *in absentia*, before that removal was later vacated. ██████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████  On July 15, 2019, Defendant again violated the terms of his $12,000 bond by failing to appear for his I-340 interview.

In addition to violations of the terms of his bond, Defendant has a history of fleeing from law enforcement and resisting arrest.  Immigration authorities sought to arrest Defendant outside of his brother's house on September 19, 2019 after surveilling his last known address.  They observed Defendant arguing with and pushing his girlfriend.  After an immigration officer approached and identified himself, Defendant fled on foot before he was finally apprehended.  He continued to resist as he was being walked back to the vehicle.

On January 7, 2020, police responded to Defendant's brother's residence ("the Apartment") in Daly City following a report of a domestic disturbance.  Defendant's brother asked a neighbor to call the police because Defendant and his girlfriend were arguing.  When police arrived on scene, they heard crying, whimpering, and a man grunting from the Apartment.  Neighbors reported hearing arguing and banging.  Police repeatedly knocked on the Apartment's door and announced themselves as police.  When police finally gained access to the unit, Defendant and his girlfriend were no longer there.  The sliding door in the back was open, suggesting that Defendant and his girlfriend fled upon hearing the police.  Defendant's brother later told police that he had kicked out his brother from the house because he had been causing trouble.

Defendant also sought to evade arrest in connection with this case in March 2020, when he attempted to hide while law enforcement searched for him in his brother's residence.  Homeland Security Investigation agents finally found him hiding underneath a blanket with shoes on, pretending to

1  be asleep.  Defendant was non-compliant during this entire encounter.  He repeatedly pulled on his

2  restraints, forcefully hit his head on the patrol car door frame, and kicked and bent forward in the car.

3  ### C.    Defendant's MS-13 Membership and Violent History

4  As the Court is aware, a federal grand jury found probable cause to believe that Defendant is a

5  coconspirator in the charged racketeering enterprise, MS-13 20th Street.  The government alleges that

6  Defendant is a full-fledged member of MS-13.  He sports a tattoo on his chest and shoulder with an "M"

7  and "13" melded together with a skull.  *See* Dkt. 193 at 3.  His phone contains multiple images of

8  Defendant flashing the "*garra*," the gang sign that only MS-13 members are permitted to use.  *See id*.

9  His phone also contains other MS-13 images demonstrating Defendant's allegiance to the gang.  *See id*.

10  at 4.  Approximately 15 of his phone contacts are suspected MS-13 members or associates, many with

11  whom he communicated.  These communications with suspected gang associates included images of the

12  graffiti with which rival Norteños are suspected to have tagged his house, a picture of what appear to be

13  real guns, and a picture of someone (possibly Defendant) holding a machete nearby what law

14  enforcement believes to be Defendant's bed.  *See id*. at 4.  Defendant also poses in multiple pictures

15  with other MS-13 20th Street clique members.  *See, e.g.*, *id*. at 5.

16  Law enforcement has frequently encountered Defendant in MS-13 gang territory with other 20th

17  Street members, including his co-defendants.  Such contacts occurred on at least five occasions between

18  July 2017 and February 2018.  For example, on September 5, 2017, Defendant was arrested with his co-

19  defendant, Kevin Reyes Melendez, following an assault and robbery of a 17-year-old victim.  The

20  suspects hit the victim with a broken mop handle and stole a phone and headphones.  Witnesses

21  identified Defendant as one of the perpetrators, but local authorities did not prosecute this case.

22  Defendant also assaulted a family that was out getting dinner in the Mission District on January

23  24, 2019.  Defendant is charged for his role in this assault in Count 10 of the Superseding Indictment.

24  According to the victim's mother, K.B., she was walking southbound on Valencia Street from 19th

25  Street with J.H., her 15-year-old son, and her 12-year-old nephew.  Two unknown males walked up to

26  the group and asked her son, "What gang?"  K.B. told the men that her son did not belong to a gang and

27  that he was out to get dinner with his family.  The men ultimately assaulted J.H. and the 15-year-old

28  boy, and they threw K.B. to the ground during the attack.  The attackers reportedly identified as "MS-

GOVT'S MOT. TO REVOKE RELEASE ORDER

13" during the assault, and Defendant was one of the attackers.  He is seen on security camera footage striking the 15-year-old boy.  *See* Dkt. 193, Ex. 1.  He can be seen holding a shiny object in his hand, which corroborates the victims' account that most of the attackers possessed knives.

Defendant's longstanding involvement in the MS-13 clique is apparent from other incidents as well.  On May 16, 2019, Defendant was shot during a gang-related confrontation at Dolores Park, which MS-13 claims as its territory.  Defendant denied knowing who shot him, but recorded jail calls indicate that 20th Street clique members who were out of custody communicated with in-custody gang members regarding the incident.  They talk about Defendant as though he is one of their own, they discuss how an East Bay gang is believed to be responsible, and they discuss what action, if any, the gang should take.

## III.   ARGUMENT

### A.   Legal Standard

The Bail Reform Act of 1984 permits pretrial detention of a defendant without bail where "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community."  18 U.S.C. § 3142(e)(1).  Detention is appropriate where a defendant is either a danger to the community or a flight risk; it is not necessary to prove both.  *United States v. Motamedi*, 767 F.2d 1403, 1406 (9th Cir. 1985).  A finding that a defendant is a danger to the community must be supported by clear and convincing evidence.  18 U.S.C. § 3142(f)(2)(B).  A finding that a defendant is a flight risk need only be supported by a preponderance of the evidence.  *Motamedi*, 767 F.2d at 1406.

The Court must consider four factors in determining whether the pretrial detention standard is met:  (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant, including the defendant's character, physical and mental condition, family and community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings, as well as whether the crime was committed while the defendant was on probation or parole; and (4) the nature and seriousness of the danger to any person or to the community that would be posed by the defendant's release.  18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).  "[T]he Bail Reform Act mandates an [1] individualized evaluation [2] guided by the factors articulated in

1    § 3142(g)." *United States v. Diaz-Hernandez*, 943 F.3d 1196, 1199 (9th Cir. 2019). Categorical grants

2    or denials of bail, not tethered to an individualized determination, are impermissible. *Id.* Consideration

3    of factors outside the articulated factors set forth in Section 3142 is also disfavored. *Id.*

4         On a bail appeal, the Court "should review the evidence before the magistrate and make its own

5    independent determination whether the magistrate's findings are correct, with no deference." *United*

6    *States v. Koenig*, 912 F.2d 1190, 1193 (9th Cir. 1990). The record is not limited to those facts that were

7    presented to the magistrate judge. Rather, this Court should "make its own 'de novo' determination of

8    the facts," and the "ultimate determination of the propriety of detention is to be decided without

9    deference to the magistrate's ultimate conclusion." *Koenig*, 912 F.2d at 1193.

10   **B.      No Conditions Can Reasonably Mitigate Defendant's Flight Risk**

11        The record amply supports, more than by a preponderance of the evidence, that no condition or

12   combination of conditions can mitigate Defendant's risk of flight. Defendant does not have legal status

13   in the United States and has six known aliases. He does not have a car or a phone, which made it

14   difficult for the government to locate him when arresting him in the present case. Defendant has fled

15   from police three times, and resisted orders from authorities on two of those occasions. He already has

16   an Interpol Red Notice as a fugitive in El Salvador. He has violated the terms of his immigration bond

17   three times (twice by missing I-340 interviews and once by missing court).[2] These violations occurred

18   before he ever faced significant criminal liability. Now faced with a federal RICO conspiracy charge,

19   Defendant has even greater incentive to flee – either by leaving the United States altogether or by hiding

20   out in California or even in the Bay Area. These are all areas where MS-13 is known to have influence

21   and the ability to support members in hiding.

22        **1.      Defendant Cannot Be Trusted to Follow the Terms of Release**

23        A defendant released on bond is making a promise to the Court that he will abide by the terms of

24   release. In this case, Judge Beeler specifically made Defendant promise that this time he will behave

25   differently from how he has behaved in the past. Though Defendant made that promise, the record

26   reflects that his word is not to be trusted.

27

28        [2] Defendant claims that he did not receive notice of the court hearing. The government does not represent to know the specifics of whether or not Defendant actually received notice. However, it has serious concerns about the truth of other representations Defendant has made ██████████████

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17

18    Defendant has significant ties to El Salvador, as that is his native country and his parents still live

19 there. El Salvador is also the home base for MS-13. The magistrate court stated that Defendant was

20 unlikely to flee to El Salvador, in part because he is contesting his immigration case here. However,

21 Defendant was not previously facing criminal liability in a federal racketeering case. The allegations in

22 the indictment, if proven, may harm his immigration case as well. Being deported to El Salvador may

23 result in Defendant being taken into custody there on the Red Notice, whereas entering the country on

24 his own may not. He may be able to garner the support of MS-13 cliques located there. He therefore

25 still has an incentive to flee abroad in order to avoid consequences in this case.

26    The magistrate court did not specifically address the domestic flight risk posed by Defendant,

27 despite the government pointing out that Defendant would be particularly difficult to locate if he were to

28 flee. Defendant has not had a car or his own phone for almost the past two years, which made it difficult

1   for Homeland Security Investigations agents to locate and arrest him in this case.  Indeed, Defendant's

2   co-defendant, Luis Veliz-Diaz, absconded from immigration custody by removing an ankle bracelet and

3   was in the wind for approximately a year.  Defendant, too, would be difficult to track down if he

4   removed his ankle monitor and absconded, even if he did not flee abroad.

5       Making domestic flight more possible is the fact that MS-13 cliques exist all over California and

6   the United States.  The 20th Street clique maintains relationships with other MS-13 cliques in the

7   country and abroad, including a clique in Los Angeles.  With the support of other MS-13 members,

8   Defendant could abscond to any number of locales.  Defendant has mobility despite not having his own

9   car.  Defendant's old phone contains data showing that it was active all over the Bay Area, including

10  Mountain View, Sunnyvale, Oakland, San Francisco, and Daly City.  Therefore Defendant has the

11  means to move around to evade law enforcement detection.

12          **3.      The Siblings' Concerns About Defendant's Compliance Raise Red Flags**

13      The Court noted that the Defendant's siblings know him best, and that the risk posed by

14  Defendant is mitigated by their support.  The government agrees that his siblings may know him well –

15  which is precisely what makes their repeated reluctance to serve as sureties and custodians alarming.

16      Defendant's siblings have a good reason to doubt Defendant's ability to comply with bond terms.

17  He lived with his brother in Daly City while released on a bond in his immigration case.  He was a fully

18  engaged member of MS-13 during this time, and repeatedly got into trouble—so much so that his

19  brother threw him out of the house and called the police on him in one instance.  Defendant also lived

20  with his sister (his current custodian).  Therefore while he may not have been entirely honest with them

21  about his activities in the gang, they at least have some awareness of his misconduct.

22      Defendant's siblings twice told Pretrial Services that they did not feel comfortable signing onto

23  the unsecured bond.  They also shared that sentiment with the magistrate court multiple times at the

24  December 22 hearing, even after the court lowered the unsecured bond from $100,000 to $50,000.

25  Defendant's brother finally agreed to be a surety on December 24, but only if the Court assured him that

26  he could back out of being a surety at any time.  The fact that his brother, after several refusals, required

27  this "assurance" gives the government little assurance about Defendant's ability to comply with the

28  terms of release.  Even more telling, Defendant's sister has continued to refuse to be a surety.  Despite

1  all the love and support he has received from his siblings in the past, Defendant has not shown that he

2  takes conditions of release seriously.

3       There also is no backup plan if his brother decides that he no longer wants to be a surety.  If his

4  brother asks the Court to place the matter on calendar, Defendant would have even more incentive to

5  flee to avoid being taken into custody again.

6      **C.**    **Defendant's Past Violence While Released on Bond Demonstrates That His Danger to the Community Cannot be Mitigated**

7

8       The government has extensively proffered the danger Defendant poses to the community.  *See*

9  Dkt. 193 at 8; 10.  The magistrate court correctly concluded that Defendant posed a danger to the

10  community.  However, it also concluded that the opportunity to live with a sibling would help mitigate

11  this danger.  The government respectfully disagrees since Defendant committed most of the violence

12  proffered in this memorandum while he was already living with a sibling while released on bond.  The

13  charged violent assault on the family in the Mission, the Dolores Park gang shooting, and the Daly City

14  police encounter all happened while Defendant was released on bond.

15       There is no reason to believe that this time will be any different. While electronic monitoring

16  could limit the harm that Defendant could do if he actually complied with his release terms, as discussed

17  above, there is little reason to believe that he will do so.  Being located in Stockton also would not

18  preclude him from linking up with other local MS-13 cliques to engage in gang activity.

19       The circumstances of release contemplated here are similar to those of his immigration bond —

20  that Defendant would be released and live with a sibling with money posted as bond.  These conditions

21  were not sufficient then, nor are they sufficient now.

22  **IV.**    **CONCLUSION**

23       Defendant already is a fugitive in one country.  If released, he likely will become one in another.

24  Defendant has a history that includes ignoring bond conditions, fleeing from law enforcement, and lying

25  to a court.  The record amply supports Pretrial Services' conclusion that no combination of conditions

26  can reasonably mitigate Defendant's risk of flight.  The government also contends that Defendant's

27

28

GOVT'S MOT. TO REVOKE RELEASE ORDER

1  danger to the community cannot be mitigated since his past violence also occurred while living with his

2  siblings on release.  The Court should revoke the release order and detain Defendant pending trial.

3  DATED:  December 24, 2020                          Respectfully submitted,

4                                                     DAVID L. ANDERSON
                                                      United States Attorney
5

6                                                         /s/  *Aseem Padukone*
                                                      ASEEM PADUKONE
7                                                     ANDREW SCOBLE
                                                      Assistant United States Attorneys
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28